<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| JOSE MATIAS P.C. aka MARIO L.V., | Civil Action No. 20-5683 (JMV) |
| Petitioner, |  |
| v. | **OPINION** |
| UNITED STATES DEPARTMENT OF HOMELAND SECURITY, et al., |  |
| Respondents. |  |

**VAZQUEZ, District Judge:**

Petitioner Jose Matias P.C.,[1] aka Mario L. V.[2] filed a Verified Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2241, seeking to be released from immigration detention. D.E. 4. For the reasons detailed below, the Court denies the Petition.

**I.  Background**

Petitioner is an immigration detainee being held by the Department of Homeland Security, Immigration and Customs Enforcement ("DHS/ICE") at the Hudson County Correctional Facility ("HCCC") in Kearny, New Jersey. The instant action was filed in the wake of the ongoing

---

[1] Petitioner is identified herein only by his first name and the first initials of his surname in order to address certain privacy concerns associated with § 2241 immigration cases. This manner of identification comports with recommendations made by the Judicial Conference of the United States' Committee on Court Administration and Case Management.

[2] Petitioner submits that he is currently detained as Mario L.V. and presumes that he may be listed in ICE's record under this alias as a result of his providing this name upon being apprehended by immigration officials shortly after his entry into the United States on or about 2006. D.E. 4-1 at 5.

COVID-19 pandemic[3]; both personnel and detainees at HCCC have contracted the virus.  D.E. 4-1 at ¶¶ 36-37.

Petitioner is thirty-two years old and has been detained since December 6, 2019.  D.E. 4-1 at ¶¶ 10, 17.  Petitioner is subject to discretionary detention under 8 U.S.C. § 1226(a).  D.E. 18 at 7.  On December 6, 2019, Petitioner was served with a "Notice to Appear" charging him as an alien present in the United States without being admitted or paroled, or who arrived in the United States at any time or place other than as designated by the Attorney General pursuant to Section 212(a)(6)(A)(i) of the Immigration and Nationality Act ("INA").  D.E. 18-6 at 1.  Petitioner's criminal history is comprised solely of a November 25, 2019, arrest in Suffolk County, New York for operating a motor vehicle while intoxicated and other related offenses.  D.E. 18-9 at 5.

On March 9, 2020, an Immigration Judge ("IJ") denied Petitioner's application for cancellation of removal and adjustment of status for certain nonpermanent residents under Section 240 (A)(b) of the INA, and ordered him removed to Guatemala.  D.E. 18-11 at 1.  Petitioner filed an appeal of the IJ's decision to the Board of Immigration Appeals (" BIA") on April 6, 2020, which remains pending.  D.E. 4-1 at ¶ 24.

On May 7, 2020, Petitioner filed the current Petition in the United States District Court for the Southern District of New York.  D.E. 4.  On the same day, District Judge Paul A. Engelmayer

---

[3] COVID-19 is an abbreviation of the coronavirus disease 2019, a respiratory illness that can spread from person to person, that was declared a pandemic by the World Health Organization ("W.H.O.") on March 11, 2020.  *See* Centers for Disease Control and Prevention *Coronavirus Disease 2019 Frequently Asked Questions*, https://www.cdc.gov/coronavirus/2019-ncov/faq.html#covid19-basics (last visited Apr. 7, 2020); *see also* William Wan, *WHO declares a pandemic of coronavirus disease covid-19*, Washington Post, https://www.washingtonpost.com/health/2020/03/11/who-declares-pandemic-coronavirus-disease-covid-19/ (last visited Apr. 7, 2020).

issued an order transferring the matter to the District of New Jersey. D.E. 5. Petitioner asks the Court to order his immediate release in light of the COVID-19 pandemic during the pendency of his appeal to the BIA. D.E. 4-1 at ¶ 54.

### A. COVID-19

The COVID-19 pandemic is at the heart of this case. Judge John E. Jones III, in a thoughtful opinion, described the situation as follows:

> In a matter of weeks, the novel coronavirus COVID-19 has rampaged across the globe, altering the landscape of everyday American life in ways previously unimaginable. Large portions of our economy have come to a standstill. Children have been forced to attend school remotely. Workers deemed 'non-essential' to our national infrastructure have been told to stay home. Indeed, we now live our lives by terms we had never heard of a month ago—we are "social distancing" and "flattening the curve" to combat a global pandemic that has, as of the date of this writing, infected 719,700 people worldwide and killed more than 33,673. Each day these statistics move exponentially higher.

*Thakker v. Doll*, Civ. Docket No. 20-cv-480, --- F. Supp. 3d ---, 2020 WL 1671563, *2 (M.D. Pa. Mar. 31, 2020) (footnotes omitted). Judge Jones accurately pointed to the swift growth of cases. Since his opinion dated March 31, 2020, the number of worldwide cases and deaths has risen from 719,700 and 33,673 to 4,962,707 and 326,459.[4]

New Jersey has been particularly hard hit, with the northern part of the state bearing the initial brunt. As of May 21, 2020, New Jersey had 151,472 cases and 10,843 deaths. *COVID-19 Information Hub*, STATE OF NEW JERSEY, https://covid19.nj.gov/ (last visited May 22, 2020). The total number of cases and deaths for Bergen County, Essex County, and Hudson

---

[4] *Coronavirus Disease (COVID-19) Pandemic*, WORLD HEALTH ORGANIZATION, https://www.who.int/emergencies/diseases/novel-coronavirus-2019 (last visited May 22, 2020).

County, respectively, were 17,583/1,508, 16,906/1,576, and 17,814/1,121 deaths. *Id.* New Jersey has taken numerous steps, such as the Governor's initial stay-at-home order issued on March 21, 2020, to combat the virus and the recent decision to extend the public health emergency declaration for an additional thirty days.[5] In addition, New Jersey has closed schools, beaches, state parks, and county parks.[6] Certain of the initial restrictions have been partially lifted.

COVID-19 is a type of highly contagious novel coronavirus that is thought to be "spreading easily and sustainably between people." *How Coronavirus Spreads*, CENTERS FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/prepare/transmission.html ("*How Coronavirus Spreads*") (last visited May 14, 2020). The National Institutes of Health reports that the virus "is stable for several hours to days in aerosols and on surfaces[.]"[7] COVID-19 is "spread mainly from person-to-person." *Id.* This person-to-person spread can occur (1) between persons who are in close contact, meaning within six feet, and (2) by respiratory droplets when an infected person sneezes, coughs, or talks. *Id.* The virus can also be spread by infected persons who are not showing symptoms. *Id.*

Symptoms of COVID-19 can be mild. However, the effects of COVID-19 can be drastically more severe in older individuals or those with certain medical conditions, including

---

[5] *Murphy extends N.J. coronavirus public-health emergency for 30 days. State of emergency remains in effect*. N.J.com, https://www.nj.com/coronavirus/2020/05/murphy-extends-nj-coronavirus-public-health-emergency-for-30-days-state-of-emergency-remains-in-effect.html (last visited May 12, 2020).

[6] *New Jersey closes state parks, state forests and county parks as more than 200 new COVID-19 deaths reported*, 6abc, https://6abc.com/covid19-cases-us-coronavirus-symptoms/6083512/ (last visited April 7, 2020).

[7] *New Coronavirus Stable for Hours on Surfaces*, NATIONAL INSTITUTE OF HEALTH, https://www.nih.gov/news-events/news-releases/new-coronavirus-stable-hours-surfaces (last visited April 8, 2020)

persons with asthma, lung disease, heart diseases, diabetes, chronic kidney disease, liver disease or those who are immunocompromised.[8] Besides death, COVID-19 can cause serious, potentially permanent, damage to lung tissue, and can require extensive use of a ventilator. Early evidence suggests that the virus "can damage lung tissue causing a 20 to 30 percent decrease in lung function[.]" D.E. 1 at ¶ 29 (citation omitted). In addition, complications from the virus can manifest rapidly. *Id.* (citation omitted). There is currently no vaccine for COVID-19, nor are there known, clinically-tested therapeutic treatments. *Id.* at ¶ 30. To combat the virus, health officials have emphasized education, social distancing (*i.e.* staying at least 6 feet apart), and improved hygiene. *Id.* (citation omitted).

### B. HCCC Conditions

In response to the pandemic, ICE has taken affirmative steps to lessen the risk of exposure. ICE Guidance on COVID-19, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, https://www.ice.gov/coronavirus (last visited on May 23, 2020). For example, ICE temporarily suspended all social visitation at detention facilities. *Id.* ICE also released approximately 160 individuals who were over the age of 60 or pregnant. *Id.* ICE further instituted screening guidance for new detainees and indicates that it is testing detainees for COVID-19 as per CDC guidance. *Id.* Further, ICE provided a list of health conditions that detention facilities should consider in favor of release. D.E. 16-3 at 2-3.

Respondents submitted a declaration from Ron Edwards, the director of HCCC, which details the facility's efforts to prevent and manage the virus. D.E. 18-5. As of the date of

---

[8] *People Who Are at Higher Risk of Severe Illness*, CENTERS FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html (last accessed April 8, 2020).

Edwards's declaration dated May 18, 2020, he confirmed that 17 ICE detainees have tested positive for COVID-19 overall, and one ICE detainee tested positive within the prior week. *Id.* at ¶ 20. Additionally, 27 county and federal inmates tested positive but no new positive cases were reported amongst those two populations in the week prior [9]; and 97 members of the correctional staff had tested positive. *Id.* All staff members who were in proximity of those who tested positive, were instructed to self-quarantine for a fourteen-day period. *Id.* Of the 350 law enforcement officers at HCCC, 284 were tested for COVID-19 and 97 tested positive. *Id.* at ¶ 22. Of the 97 that tested positive, 84 have recovered and resumed their professional duties. *Id.* Finally, two members of the HCCC correctional staff, a facilities commissary director, and two nurses at HCCC have died from COVID-19 related complications. *Id.* at ¶ 21.

Edwards details the efforts of HCCC to deal with the virus. Edwards reports that HCCC is currently operating well under capacity and that most immigration detainees are assigned their own cell, which is designed for two people. *Id.* at ¶ 10. He states that HCCC has provided informational hand-outs as to COVID-19 and that detainees have space to "sit at least six feet apart." *Id.* at ¶ 6.

Health care at HCCC is administered by Wellpath, with an on-site facility physician who is on call on a twenty-four hours basis. *Id.* at ¶ 7. There is also an on-site infirmary, and in an effort to combat the COVID-19 outbreak, HCCC has increased medical staff, including RNs and LPNs, on site at all times. *Id.*

HCCC also revised its intake process. *Id.* at ¶ 12. New detainees are "screened for disabilities upon admission and their temperatures are checked." *Id.* at ¶ 8. New

---

9 Immigration detainees are housed in a separate unit and do not come in contact with the inmates. Further, separate correctional staff are assigned to the ICE detainees. D.E. 18-5 at ¶ 4.

inmates/detainees undergo a screening, which includes a temperature check and a medical and travel history inquiry, in an external holding area.  *Id.* at ¶12 b i, ii.   Any person with a temperature over 100.4 degrees is denied entry and must be transported by the arresting agency to the hospital.  *Id.* at ¶12.  All new inmates/detainees are placed in "lockdown" to prevent potential contamination and are not assigned to a housing unit until they are medically cleared.  *Id.*  HCCC also requires that all personnel, vendors, and civilians undergo medical screening (including temperature) readings before admission in the facility.  *Id.*.

HCCC was designed with air handlers and a purge system.  *Id.* at ¶ 5.  This allows the air within the facility to be re-circulated every four hours.  *Id.*  The "air handler" allows outside air into the unit when the "dampers" are open.  *Id.*  Dampers are currently open, therefore fresh air is circulated in the housing units throughout the day.  *Id.*

HCCC also educates detainees as to the "importance of hand washing and best practices to prevent COVID-19" and provides detainees daily access to sick call.  *Id.* at ¶ 12 d.  Detainees are each provided bars of soap, and disinfectant spray is provided to every housing unit.  *Id.* at ¶12 e. Additional cleaning staff have been added in order to increase the frequency of cleaning each day. *Id.*  Detainees may also request disinfectant wipes from staff.  The facility has a three-month supply of soap and disinfectant wipes.  D.E. 30 at ¶ 19.

If a detainee tests positive for COVID-19, but does not require hospitalization, he/she will be isolated in a cell in a designated isolation area.  *Id.* at ¶ 15.  Detainees who have had a known exposure to COVID-19 but who are asymptomatic are "cohorted," meaning that they are placed with other similar individuals for fourteen days.  *Id.* at ¶ 17.

**II.     LEGAL STANDARD**

Petitioner submits that the Respondents' deliberate indifference to the conditions of his

7

confinement violates his Eighth Amendment right to be free from cruel and unusual punishment. D.E. 4-1 at ¶¶ 45-51. He argues that his not having personally exhibited any COVID-19 related symptoms is inconsequential. *Id.* at ¶ 49. He also submits that detainees are not being given adequate protective equipment, are not given gloves unless they are cleaning common areas, and he has only received two masks.

Because he is seeking immediate release, the Court considers his claim as a request for preliminary injunctive relief. *See Hensley v. Trempus*, Civ. Action No. 18-355, 2019 WL 958091 at *1 (W.D. Pa. Jan. 17, 2019). Preliminary injunctions are governed by Federal Rule of Civil Procedure 65 and Local Civil Rule 65.1. Injunctive relief may only be granted when a party demonstrates that he has a reasonable probability of success on the merits, he will suffer immediate and irreparable harm if the injunction does not issue, the grant of preliminary relief will not result in greater harm to the nonmoving party, and the injunctive relief is in the public interest. *New Jersey Retail Merchants Ass'n v. Sidamon-Eristoff*, 669 F.3d 374, 385-86 (3d Cir. 2012) (citing *Crissman v. Dower Down Entm't Inc.*, 239 F. 3d 357, 364 (3d Cir. 2001)).

Like injunctive relief in general, granting bail to a habeas petitioner is an extraordinary remedy. *See Landano v. Rafferty*, 970 F.2d 1230, 1239 (3d Cir. 1992) (indicating that a court may only grant release pending a disposition of federal habeas claims when the petitioner has raised "substantial constitutional claims upon which he has a high probability of success, and ... when extraordinary or exceptional circumstances exist which make the grant of bail necessary to make the habeas remedy effective") (citation omitted); *see also In re Souels*, 688 F. App'x 134, 135-36 (3d Cir. 2017).

### III.    DISCUSSION

The Court finds that Petitioner has not established a reasonable likelihood of success on

the merits. Before delving into the relevant analysis in this case, the Court notes the following. The Court is well-aware of the seriousness of the COVID-19 pandemic, and the Court likewise recognizes that county jails and detention facilities were not designed with pandemics in mind. During the pandemic, the Court has received requests for habeas relief from civil immigration detainees that fall into three general categories: (1) detainees who do not fall into a particularly vulnerable category; (2) detainees who fall into a particularly vulnerable category (based on age or underlying medical/physical conditions); and (3) detainees who have tested positive for COVID-19. As to the first category, the Court has denied relief without prejudice. *See Ousman D. v. Decker*, Civil Action No. 20-2292, 2020 WL 1847704 (D.N.J. Apr. 13, 2020). At the same time, the Court recognizes that merely because a person does not fall into a vulnerable category does not mean that he or she will not experience severe symptoms if he or she contracts the virus. The Court has denied those petitions without prejudice because information concerning COVID-19 is subject to change, and as additional information becomes available, the Court could reach a different conclusion as to those detainees who currently are not considered unusually vulnerable. As to the second category, the Court has ordered release provided that the legitimate interests of ICE (in particular, flight risk and dangerousness) can be accommodated by the conditions of release. *See Rafael L.O. v. Tsoukaris*, Civil Action No. 20-3481, 2020 WL 1808843 (D.N.J. Apr. 9, 2020). As to the third category – detainees who have the virus – the Court has found that the analysis changes. *See Sergio S.E. v. Rodriguez*, Civil Action No. 20-3982, 2020 WL 2111029 (D.N.J. May 4, 2020); *Derron B. v. Tsoukaris*, Civil Action No. 20-3679, 2020 WL 2079300 (D.N.J. Apr. 30, 2020). Before a detainee contracts the virus, the public has an interest in preventing further positive cases. In addition to the health and welfare of the detainee, the public also has an interest in seeing that scarce medical resources are conserved. Yet, once a detainee

tests positive, the public also has an interest in not introducing additional cases into the general public. Once a detainee tests positive, in the Court's view, the critical question is whether the detainee is receiving constitutionally adequate care. As a result, once a detainee tests positive, the Court does not order release but instead remains available on short notice to address any issues that may arise as to adequacy of medical care. To this end, the Court has inquired of facilities as to whether detainees can seek medical attention twenty-four hours a day (in case symptoms worsen) and, if necessary, how long it will take to transport a detainee to a hospital or medical center.

### A. Fifth Amendment Conditions of Confinement Claim

Notwithstanding Petitioner having only raised an Eighth Amendment claim, he is a civil detainee as opposed to a criminal prisoner who has been convicted and sentenced, therefore his conditions of confinement claim will be analyzed under the Due Process Clause of the Fifth Amendment, as opposed to the Eighth Amendment. *Bell v. Wolfish*, 441 U.S. 520, 535-36 (1979). Civil immigration detainees are entitled to the same due process protections as pretrial detainees when the conditions of confinement fall below constitutional minimums. *E.D. v. Sharkey*, 928 F.3d 299, 306-07 (3d Cir. 2019).

The Third Circuit has articulated the following relevant standards:

> To determine whether challenged conditions of confinement amount to punishment, this Court determines whether a condition of confinement is reasonably related to a legitimate governmental objective; if it is not, we may infer "that the purpose of the governmental action is punishment that may not be constitutionally inflicted upon detainees *qua* detainees."

*E. D. v. Sharkey*, 928 F.3d at 307 (quoting *Hubbard v. Taylor*, 538 F.3d 229, 232 (3d Cir. 2008)). As a result, the Court must ascertain whether the conditions serve a legitimate purpose and whether

the conditions are rationally related to that legitimate purpose. *Hubbard* 538 F.3d at 232.

A condition or purported deprivation amounts to punishment if the "disability is imposed for the purpose of punishment" in other words, there is "an expressed intent to punish on the part of detention facility officials;" no "alternative purpose to which may rationally be connected is assignable for it" or is "excessive in relation to the alternative purpose assigned [to it]." *Bell*, 441 U.S. at 538 (internal citation omitted). The "inquiry into whether given conditions constitute punishment must consider the totality of circumstances within an institution." *Hubbard*, 399 F.3d at 160 (internal quotation marks and citations omitted).

District Courts have reached different conclusions when conducting this inquiry in the context of the current pandemic. In *Dawson v. Asher*, Case No. C20-0409, 2020 WL 1304557 (W.D. Wash. Mar. 19, 2020), Judge James L. Robart found that the immigration detainees did not face improper punishment. *Id.* at *2. Judge Robart explained that the petitioner's detention was reasonably related to a legitimate governmental objective because there was no evidence that the respondents intended to punish the petitioners, respondents had a legitimate governmental objective in preventing detained aliens from absconding and ensuring their appearance at removal proceedings, and the petitioners' confinement did not appear excessive in relation to the legitimate objective. *Id.*

The district judge in *Thakker v. Doll*, Civ. Docket No. 20-cv-480, - F. Supp. 3d -, 2020 WL 1671563, *8 (M.D. Pa. Mar. 31, 2020), reached a different conclusion. Judge John E. Jones III noted that an express intent to punish was not necessary and then found that the detention in question did not bear a rational relationship to a legitimate government objective. *Id.* Judge Jones reasoned that housing immigration detainees in close proximity and in unsanitary conditions, in light of the pandemic, did not meet a legitimate governmental objective. *Id.* Judge Jones

indicated that preventing aliens from absconding would constitute a legitimate governmental aim but this objective was deeply weakened in light of COVID-19, particularly when ICE had many other options to monitor civil detainees.[10]  *Id.*

The Court agrees with the *Thakker* court that COVID-19 alters the analysis.  As noted, the Court also recognizes that jails are not designed with pandemics in mind.  However, courts that have found that the conditions did not bear a rational relationship to a legitimate governmental interest in light of the pandemic, have also indicated that the individual detainee's underlying health condition weighed heavily in its analysis.  *See, e.g.*, *Rafael L.O. v. Tsoukaris*, Civ. Action No. 20-3481, 2020 WL 1808843, *8 (D.N.J. Apr. 9, 2020); *Thakker*, 2020 WL 1671563, *4, 6.  The Court also agrees that a petitioner's individual circumstances (that is, his or her medical condition) are critical to the analysis.

Petitioner argues that individuals of any age or health status can die of COVID-19 and that the Court or government should not be in the position of picking and choosing[11] who should be released.  Respondents state that Petitioner's health and medical condition is a relevant consideration.  D.E. 18 at 23-25.

Petitioner is relatively young and does not have any underlying heath conditions that have been identified as potentially exacerbating the effects of COVID-19 should he contract it.  The

---

10 Since the TRO was granted in *Thakker*, Judge Jones has denied preliminary injunctive relief to several detainees, citing the facility's ongoing improvements in its response to COVID-19. *Thakker v. Jones*, Civ. Action No. 1:20-480, ---F. Supp.---3d, 2020 WL 2025384 at *11 (M.D. Pa. Apr. 27, 2020).

[11] As to the "picking and choosing" argument, the Court determines that it is an oversimplification of the current issue.  The Court considered up-to-date medical guidance as to COVID-19, ICE and HCCC's responses to the pandemic and evolving medical guidance, as well as the personal characteristics of Petitioner.

Court also notes that HCCC has been particularly hard hit by COVID-19, but the record also reflects that the facility has taken concrete steps to improve conditions. Critically, the efforts of HCCC have shown actual, concrete results. There was only one positive case in the last week and Respondents are making their release decisions based on healthcare guidance. In light of these factors, the current conditions at ECCC are not excessive in light of the government's legitimate purpose.

The Court does not find that Petitioner has established a reasonable likelihood of success on the merits.[12]

---

12 Petitioner solely raises a "deliberate indifference" claim in his petition. D.E. 4-1. Because the current pandemic represents unchartered territory in recent jurisprudence, the parties are understandably drawing from analogous situations. One of those situations is cruel and unusual punishment under the Eighth Amendment, which applies a deliberate indifference standard to medical treatment (or lack thereof). *See*, e.g., *Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 581-82 (3d Cir. 2003); *Parkelll v. Morgan*, 682 F. App'x 155, 159-60 (3d Cir. 2017); *King v. Cnty. Of Gloucester*, 302 F. App'x 92, 96 (3d Cir. 2008). "To act with deliberate indifference to serious medical needs, is to recklessly disregard a substantial risk of serious harm." *Harvey*, 263 F. App'x at 191 (citing *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976) and *Farmer v. Brennan*, 511 U.S. 825, 836 (1994)).

However, the Court finds that the Eighth Amendment is not applicable because Petitioners are not convicted criminal inmates but civil immigration detainees. As noted, the Court evaluates the Petitioners' claims under the Due Process Clause of the Fifth Amendment, which prohibits "punishment" of a civil detainee. *See Natale*, 318 F.3d at 581; *see also Hubbard v. Taylor*, 399 F.3d 150, 157-60 (3d Cir. 2005). As a result, the Court finds that the deliberate indifference standard merely sets the floor, rather than the ceiling, of constitutionally required medical care in this matter.

**IV.    Conclusion**

The Court denies without prejudice the Petition for writ of habeas corpus pursuant to 28 U.S.C. § 2241.[13]  An appropriate Order accompanies this Opinion.

Dated: 5/27/2020

                                              JOHN MICHAEL VAZQUEZ
                                              United States District Judge

---

[13] Petitioner does not raise any additional non-COVID 19 related claims in his underlying habeas petition.